**Certiorari Granted, January 19, 2016, No. S-1-SC-35614**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2016-NMCA-016**

**Filing Date: October 26, 2015**

**Docket No. 33,084**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellee,**

**v.**

**PETER CHAVEZ,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF GRANT COUNTY**
**H.R. Quintero, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Sri Mullis, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**WECHSLER, Judge.**

**{1}** Defendant Peter Chavez appeals his convictions for the crimes of aggravated fleeing a law enforcement officer (aggravated fleeing), contrary to NMSA 1978, § 30-22-1.1 (2003), and resisting, evading, or obstructing an officer, contrary to NMSA 1978, § 30-22-1(B) (1981). Defendant argues that under his interpretation of the aggravated fleeing statute, § 30-

22-1.1, the evidence was insufficient to prove that he endangered the life of another person. Additionally, Defendant challenges his conviction for aggravated fleeing on the grounds that the jury instruction failed to include an essential element of the crime. He further contends, in the alternative, that his convictions violate the double jeopardy protection against multiple punishments for the same offense. Because we are persuaded that a conviction under the aggravated fleeing statute requires a finding of actual endangerment, and that the direct and circumstantial evidence at trial was insufficient to support a finding of actual endangerment beyond a reasonable doubt, we need not address his jury instruction and double jeopardy challenges. Accordingly, we reverse Defendant's conviction for aggravated fleeing.

## BACKGROUND

**{2}** At approximately 10:00 p.m. on November 6, 2012, Silver City police officer Joseph Arredondo was patrolling in Grant County when he observed a dirt bike traveling eastbound on Highway 180 without any lights illuminated. Officer Arredondo caught up with the dirt bike at an intersection and noticed that the vehicle did not have a license plate. The officer activated his emergency lights and followed the dirt bike as it turned into a Wal-Mart parking lot. The driver looked back over his shoulder at the officer, but instead of pulling over, he accelerated through the parking lot. Defendant jumped the curb of the Wal-Mart parking lot, drove onto a dirt path, and entered the parking lot of the Tractor Supply Store. Officer Arredondo followed the dirt bike in his police cruiser toward the Tractor Supply Store and activated his emergency siren while pursuing Defendant through the parking lots. Two cars, one traveling eastbound and one traveling westbound on Highway 180, were forced to slow down as Defendant and Officer Arredondo exited the parking lot. No other vehicles were in the area.

**{3}** As Defendant and Officer Arredondo traveled along the highway, approximately five cars pulled over to the side of the highway to avoid the chase. Officer Arredondo testified that Defendant's speed on Highway 180 reached approximately sixty-five miles per hour, which was ten miles over the highway's posted speed limit. At least three other police units joined the pursuit before Defendant turned from the highway onto a side street, slowed down to approximately forty to forty-five miles per hour, and then proceeded onto another side street where he accelerated back to speeds of approximately sixty miles per hour. While traveling on these side streets Defendant ran through three stop signs. Defendant and the pursuing officers did not encounter any other traffic after leaving Highway 180. Defendant then turned onto a dirt road, crossed a cattle guard, drove off-road into an open pasture, and went up a hill. Grant County Sheriff's Office deputy, Manuel Galaz, continued the chase over the hill after Officer Arredondo blew a tire and disengaged from the pursuit. Deputy Galaz was driving approximately fifteen to twenty miles per hour during the off-road pursuit. As he crested the hill in his patrol car, Deputy Galaz saw the dirt bike stopped on the other side. Deputy Galaz hit the brakes to stop his cruiser and slid downhill into the back of the dirt bike. The impact caused Defendant to fall off the dirt bike, at which point Defendant attempted to flee on foot. Officer Galaz gave chase and arrested Defendant shortly thereafter. At trial, Silver City Police Department officers Arredondo and Rascon testified that no

2

public safety issue arose during the pursuit and that no person was endangered by Defendant's conduct.

**AGGRAVATED FLEEING A LAW ENFORCEMENT OFFICER**

**{4}** The aggravated fleeing statute reads, in pertinent part, that a person commits aggravated fleeing by "willfully and carelessly driving [a] vehicle *in a manner that endangers the life of another person* after being given a visual or audible signal to stop . . . by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle[.]" Section 30-22-1.1(A) (emphasis added). A violation of Section 30-22-1.1(A) is a fourth degree felony. Section 30-22-1.1(B). Endangerment of another person is an essential element of the aggravated fleeing statute. *See* UJI 14-2217 NMRA ("[T]he state must prove to your satisfaction beyond a reasonable doubt . . . [that t]he defendant drove willfully and carelessly in a manner that endangered the life of another person[.]").

**{5}** We view the aggravated fleeing statute as evincing legislative intent to more severely punish people who jeopardize the safety of others while fleeing from law enforcement officers. Historically, conduct intended to thwart the efforts of an arresting officer constituted the misdemeanor crime of resisting, evading, or obstructing an officer. Section 30-22-1. As noted by our Supreme Court, "[t]he legislative decision to create the crime of aggravated fleeing suggests a hierarchy of criminal liability based on the aggravated nature of a defendant's conduct." *State v. Padilla* (*Padilla II*), 2008-NMSC-006, ¶ 14, 143 N.M. 310, 176 P.3d 299. This aggravated nature exists specifically "when the person flees in a manner that endangers the lives of others[.]" *Id.* Importantly, the Legislature chose not to repeal any portion of Section 30-22-1 upon the enactment of Section 30-22-1.1. Instead, the resisting, evading, or obstructing an officer statute remains in effect and criminalizes conduct related to vehicular flight from law enforcement.[1] The logical inference to be drawn from the Legislature's decision not to repeal any portion of Section 30-22-1 is that an individual may flee from law enforcement, even in a vehicle, without triggering prosecution under the aggravated fleeing statute so long as the fleeing individual does not endanger others in the process. *See generally State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022 ("We examine the overall structure of the statute and its function in the comprehensive legislative scheme.").

**PRINCIPLES OF STATUTORY INTERPRETATION**

**{6}** In order to determine the merits of Defendant's sufficiency of evidence challenge,

---

[1]The pertinent text of Section 30-22-1 reads "[r]esisting, evading or obstructing an officer consists of . . . willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed officer in an appropriately marked police vehicle[.] . . . Whoever commits resisting, evading or obstructing an officer is guilty of a misdemeanor."

3

we must first address the contrasting interpretations of the aggravated fleeing statute presented by the parties. Defendant contends that the statute's essential element of endangerment requires that the State prove that a defendant actually endangered the life of another person while willfully and carelessly driving a vehicle. In this regard, Defendant argues that the Legislature did not intend to punish conduct that merely creates the potential for endangerment. Conversely, the State argues that the statute's essential element of endangerment is satisfied when a defendant's conduct either places an identifiable person in actual danger or creates the potential for placing any other person in danger. Insofar as these arguments present a question of statutory interpretation, we apply de novo review. *See State v. McWhorter*, 2005-NMCA-133, ¶ 5, 138 N.M. 580, 124 P.3d 215 ("The meaning of language used in a statute is a question of law that we review de novo.").

**{7}** Our goal when interpreting statutes is to ascertain and effectuate legislative intent. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047. We first look to the statute's plain language, which is "the primary indicator of legislative intent." *State v. Young*, 2004-NMSC-015, ¶ 5, 135 N.M. 458, 90 P.3d 477 (internal quotation marks and citation omitted). "If the language of the statute is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. Wilson*, 2010-NMCA-018, ¶ 9, 147 N.M. 706, 228 P.3d 490 (internal quotation marks and citation omitted). "[Appellate courts] will not read into a statute any words that are not there, particularly when the statute is complete and makes sense as written." *State v. Trujillo*, 2009-NMSC-012, ¶ 11, 146 N.M. 14, 206 P.3d 125. In the event that our application of the plain meaning rule does not indicate the true legislative intent, we may look to the history and purpose of the statute to aid our statutory construction analysis. *See State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 ("In performing our task of statutory interpretation, not only do we look to the language of the statute at hand, we also consider the history and background of the statute."). When this expanded review is necessary, we examine the language in the context of the statutory scheme, legislative objectives, and other statutes *in pari materia* in order to determine legislative intent. *State v. Cleve*, 1999-NMSC-017, ¶ 8, 127 N.M. 240, 980 P.2d 23.

**The Plain Language of the Statute**

**{8}** Neither the aggravated fleeing statute nor the associated uniform jury instruction defines the term "endangers" as used in the statute. "When a term is not defined in a statute, we must construe it, giving those words their ordinary meaning absent clear and express legislative intention to the contrary." *State v. Tsosie*, 2011-NMCA-115, ¶ 19, 150 N.M. 754, 266 P.3d 34 (internal quotation marks and citation omitted). Our courts often use dictionary definitions to ascertain the ordinary meaning of words that form the basis of statutory construction inquiries. *State v. Boyse*, 2013-NMSC-024, ¶ 9, 303 P.3d 830. "Endangerment" is defined as "[t]he act or an instance of putting someone or something in danger; exposure to peril or harm." *Black's Law Dictionary* 644 (10th ed. 2014). Non-legal dictionaries offer similar definitions of both "endanger" and "endangerment." *See The American Heritage Dictionary of the English Language* 588 (5th ed. 2011) ("To expose to harm or danger;

4

imperil."); 5 *The Oxford English Dictionary* 225 (2d ed. 1991) ("The action of putting in danger; the condition of being in danger."). Each of these definitions indicates that the exposure to peril or harm is an actual or current condition facing the impacted person. None of these definitions indicates a potential or future condition. Since the plain language of the statute does not contemplate potential or future harm in its use of the word "endanger," and the statute "makes sense"—with respect to who is subject to prosecution—as written, *Trujillo*, 2009-NMSC-012, ¶ 11, we will not read the statute to include potential harm absent direction from the Legislature. *Clark v. Lovelace Health Sys., Inc.*, 2004-NMCA-119, ¶ 14, 136 N.M. 411, 99 P.3d 232 ("When language in a statute enacted by the [L]egislature is unambiguous, we apply it as written, and any alteration of that language is a matter for the [L]egislature, not for this Court.").

**Expansion of the Scope of the Statute by Judicial Opinion**

**{9}**     The State argues that the word "potential" was effectively added to the statute by our Supreme Court as part of its holding in *Padilla II*. In *Padilla II*, our Supreme Court reinstated a conviction for aggravated fleeing following a reversal by this Court. 2008-NMSC-006, ¶ 1. The *Padilla II* Court was not asked, and did not offer, an opinion as to the definition of endangerment under the aggravated fleeing statute. However, a portion of the opinion detailed the defendant's conduct as follows:

> [The d]efendant drove in a willful and careless manner that endangered the lives of others—he ran ten stop signs, he exceeded the speed limit, there was at least one other motorist, apart from the officer, *potentially placed at risk* because of [the d]efendant's conduct, and the passengers in the car were placed at risk when [the d]efendant careened around corners causing the door with the faulty lock to open.

*Id.* ¶ 17 (emphasis added).

**{10}**     Based upon these facts, our Supreme Court held that "the defendant's conduct gives rise to the imposition [of the aggravated fleeing statute]." *Id.* ¶ 14. However, we do not believe that the Court's use of the word "potentially" was intended to indicate that anyone who flees from law enforcement necessarily endangers all persons in the vicinity during any police pursuit.

**{11}**     A comprehensive review of the factual background reveals that the defendant "ran a stop sign while going fifty miles per hour in a twenty-five mile per hour zone [and] barely missed colliding with another motorist." *State v. Padilla (Padilla I)*, 2006-NMCA-107, ¶ 5, 140 N.M. 333, 142 P.3d 921, *rev'd*, *Padilla II*, 2008-NMSC-006. On review, this Court held, "We think a rational jury could have found that [the d]efendant endangered another person . . . [including] another motorist on the road, whom [the d]efendant came close to striking." *Id.* ¶ 23. A near collision—that is, one in which the defendant "barely missed colliding with another motorist"— constitutes an actual, rather than a potential risk. *Id.* ¶ 5.

**{12}** Because the facts of *Padilla I* support a finding of actual endangerment to the other motorist, we believe that our Supreme Court's use of the word "potentially" in this context was chosen to express that a collision nearly occurred, rather than to express that another motorist was simply in the vicinity while the pursuit was taking place. Because, in *Padilla I*, other persons, including passengers and other motorists, were actually endangered, we assume that the plain language of the statute remains in effect and that only those who actually endanger others while fleeing from law enforcement are subject to punishment under the statute.[2]

## SUFFICIENCY OF THE EVIDENCE

**{13}** Having decided that the aggravated fleeing statute requires that the State prove actual endangerment to another person, we now turn to Defendant's argument that the evidence presented at trial was insufficient to support his conviction. Defendant advances a sufficiency of evidence claim only as to the essential element of endangerment inasmuch as he argues that there was insufficient evidence to prove that he endangered the life of another person.

**{14}** "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). "[W]e must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Id.* (internal quotation marks and citation omitted). "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *Id.* (internal quotation marks and citation omitted). The function of an appellate court with respect to challenges to the sufficiency of evidence is to "ensure that a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Id.* (internal quotation marks and citation omitted). We apply these principles to determine if Defendant's conviction for aggravated fleeing is supported by sufficient evidence.

**{15}** As a threshold matter, we note that drawing inferences from the previous published opinions of our courts related to aggravated fleeing is not entirely useful given that, in those cases, passengers were present in the vehicles while the drivers were fleeing from law enforcement. *See Padilla II*, 2008-NMSC-006, ¶ 4 ("[T]here were two passengers in the car[.]"); *State v. Coleman*, 2011-NMCA-087, ¶ 22, 150 N.M. 622, 264 P.3d 523 ("The lives

---

[2]The State also argues that officers were endangered when engaged in the pursuit of fleeing suspects. This argument appears foreclosed by our Supreme Court's holding in *Padilla II* that "[t]he aggravated fleeing statute does not focus upon the officer as a victim. The statute appears to be designed to protect the general public from the dangers of a high speed chase." 2008-NMSC-006, ¶ 21.

of his passengers . . . were placed in jeopardy[.]"); *State v. Ross*, 2007-NMCA-126, ¶ 2, 142 N.M. 597, 168 P.3d 169 ("There were four passengers still in the vehicle."). In the present case, Defendant was operating a dirt bike without a passenger. Because of this distinction, comparisons between the willful and careless behavior exhibited by the drivers/defendants in our previous cases[3] and the willful and careless conduct exhibited by Defendant in the present case are of limited value. Within those same cases, however, there are descriptions of conduct that demonstrate endangerment of other motorists who encountered defendants on the roadways. *See Padilla I*, 2006-NMCA-107, ¶ 5 ("[The d]efendant barely missed colliding with another motorist."); *Ross*, 2007-NMCA-126, ¶ 2 ("Another vehicle had to abruptly stop in order to avoid colliding with [the d]efendant."). It is to this conduct that we look to determine whether Defendant endangered another person within the meaning of the aggravated fleeing statute.

**{16}** Even when viewing the evidence in the light most favorable to the guilty verdict, the State has not presented sufficient evidence to prove that Defendant endangered another person as required by the statute. The uncontroverted testimony of two participating officers was that the pursuit did not create a public safety concern or place anyone in danger. While other vehicles on the roadway were required to slow down or pull over in response to the emergency lights and sirens, no evidence of near collisions was presented at trial. We do not believe that merely taking simple, evasive maneuvers in response to emergency lights and sirens constitutes endangerment to motorists on a roadway. As such, no reasonable jury could have found beyond a reasonable doubt that Defendant endangered another person within the meaning of the aggravated fleeing statute.

**{17}** This is not to say that endangerment requires that a fleeing motorist pass within inches of another vehicle or that an accident is avoided only through extraordinary evasive maneuvering by another driver. When a jury returns a verdict based on evidence indicating actual endangerment, that verdict should not be disturbed. However, when, as here, the record is completely devoid of evidence of actual endangerment to passengers or other motorists, the verdict cannot stand.

**CONCLUSION**

**{18}** For the foregoing reasons, we reverse Defendant's conviction for aggravated fleeing a law enforcement officer, contrary to Section 30-22-1.1. As a result, we do not reach Defendant's alternative double jeopardy claim, which constituted Defendant's sole challenge to his conviction for resisting, evading, or obstructing an officer, contrary to Section 30-22-1(D). That conviction therefore stands.

---

[3]These willful and careless behaviors include speeding, running through stop signs, crossing the center line, and crashing into curbs or other stationary objects. *See, e.g.*, *Padilla II*, 2008-NMSC-006, ¶ 3; *Coleman*, 2011-NMCA-087, ¶ 4; *Ross*, 2007-NMCA-126, ¶ 2.

**{19}  IT IS SO ORDERED.**

_____

**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**CYNTHIA A. FRY, Judge**

8