This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                            **No. 34,571**

**ALIVIA GARCIA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Judith K. Nakamura, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
John Kloss, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Steven J. Forsberg, Assistant Appellate Defender
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**ZAMORA, Judge.**

{1}     Defendant Alivia Garcia was convicted by a jury in metropolitan court for aggravated driving under the influence of intoxicating liquor or drugs (aggravated DWI), contrary to NMSA 1978, Section 66-8-102(D)(3) (2010, amended 2016) and careless driving, contrary to NMSA 1978, Section 66-8-114 (1978). Defendant appealed those convictions to the district court and raised two issues: (1) whether the trial court abused its discretion when it denied Defendant's motion for directed verdict where the State offered no evidence that the test Defendant refused to take had complied with statewide regulations; and, (2) whether the trial court abused its discretion by denying her requested jury instruction, pursuant to *State v. Ware*, based on three seconds missing from the officer's lapel camera video. 1994-NMSC-091, 118 N.M. 319, 881 P.2d 679. The district court issued a memorandum opinion affirming Defendant's convictions. Defendant raises these same issues on appeal to this Court as well as a claim of ineffective assistance of counsel. We affirm Defendant's convictions.

I.      BACKGROUND

{2}     On the evening of November 28, 2013, the Albuquerque Police Department (APD) set up a sobriety checkpoint in Albuquerque, New Mexico. The officers conducting the checkpoint were instructed to make contact with every vehicle and identify themselves. After doing so, the officers were to then determine whether the

driver exhibited any signs of intoxication such as bloodshot watery eyes, slurred speech, or a strong odor of alcohol that would give rise to a reasonable suspicion that the driver was under the influence of alcohol. Should any such reasonable suspicion exist, the officer were instructed to have the driver exit the vehicle, engage their lapel cameras, and continue with a DWI investigation. The standard operating procedure for lapel cameras was that every interaction that an officer had with an individual was required to be recorded. Because of the length of the checkpoint operation and the camera's limited memory card and battery power, the practice at the checkpoint on November 28 was to record only those interactions, which continued past the initial contact, and in which reasonable suspicion arose and gave rise to a continued investigation.

{3}     Sergeant Zach Cottrell, acting as a safety vehicle at the checkpoint that evening, was in charge of ensuring that the vehicles entering the checkpoint proceeded at a safe speed, as well as stopping any vehicles that attempted to avoid entering the checkpoint. Sergeant Cottrell parked in a lot near the entrance to the checkpoint. He was sitting in his vehicle when he observed a truck stop in the road for a few seconds, just past the first set of signs notifying drivers of the impending checkpoint. Sergeant Cottrell, still in his vehicle, pulled forward toward the truck, at which point the truck turned and attempted to enter a parking lot to its right that had been blocked off. The

truck, in what appeared to be an attempt to drive around the barricade and enter the parking lot, then drove up onto the curb. Sergeant Cottrell could see the driver once the truck began to drive onto the curb. Sergeant Cottrell drove toward the truck, activating his emergency lights, and stopped two to three feet in front of the truck, facing it head-on.

{4}     Sergeant Cottrell got out of his vehicle and made contact with Defendant, who was in the driver's seat of the truck. Defendant identified herself and explained that the truck had gone up onto the curb because she was not used to driving in that part of the city. Sergeant Cottrell's lapel video begins moments into Defendant's explanation. There was a male passenger in the truck who attempted to answer Sergeant Cottrell's questions for Defendant. When Sergeant Cottrell requested proof of insurance, it was the passenger who retrieved the truck's insurance information and handed it to Defendant. During his interaction with Defendant, Sergeant Cottrell observed Defendant exhibited signs of intoxication, including slow, slurred speech, bloodshot, watery eyes, and the smell of alcohol from her breath when she spoke. When Sergeant Cottrell asked if she had been drinking, Defendant admitted to having a beer two hours earlier. As a result, Sergeant Cottrell returned to his vehicle and requested a DWI unit's assistance with a DWI investigation of Defendant.

{5} Officer Jared Frazier arrived at the scene to assist Sergeant Cottrell's DWI investigation of Defendant. Sergeant Cottrell informed Officer Frazier about what had transpired up to that point. Officer Frazier approached the truck, which was still running, to make contact with Defendant. When Officer Frazier asked Defendant whether she had consumed any alcohol that evening, Defendant responded that she had two beers, but it had "been awhile" earlier. Officer Frazier asked her to exit the truck and informed her that he would be administering field sobriety tests for her to complete. She was reluctant to comply, explaining that though she had had a few drinks, she was actually taking responsibility for "that asshole," pointing to the male passenger in the truck. Defendant ultimately refused to take the field sobriety tests, and as a result, Officer Frazier placed her under arrest for DWI. Officer Frazier gave Defendant a twenty-minute deprivation period to allow any alcohol in her mouth to evaporate. Officer Frazier then read her the implied consent advisory. Officer Frazier testified that he read the following advisory:

> Listen to me while I tell you something very important. You're under arrest for DWI. The New Mexico Implied Consent Act requires you to submit to a breath test, a blood test, or both, to determine the alcohol or drug content of your blood. After you take one or both of our tests, you have the right to choose an additional, independent test. If you choose to take the additional independent test, you have a right to a reasonable opportunity to arrange for a physician, licensed nurse, laboratory technician or technologist that is employed by a hospital or physician of your own choice to perform the additional chemical test. The cost of the

5

additional independent test is paid for by the Albuquerque Police Department.

Defendant refused to take a breath test. Officer Frazier informed her of the consequences of refusal, including losing her driver's license and a possibly greater prison sentence if convicted of DWI. He again gave her a chance to take the test, and she again refused. Officer Frazier recorded his encounter with Defendant on his lapel camera.

**{6}** At the close of the State's case, Defendant moved for a directed verdict, arguing that the State had not presented evidence that the test Defendant refused met all regulatory requirements set forth by the Scientific Laboratory Division (SLD). The trial court denied Defendant's motion, concluding that the State had presented evidence sufficient to make a prima facie case of aggravated DWI. Defendant also asserted that because one of the lapel videos was missing a few seconds of the conversation between Sergeant Cottrell and Defendant, she was entitled to a jury instruction, pursuant to *Ware*, 1994-NMSC-091, ¶ 26.

**{7}** The State objected on the basis that suppression motions must be made before trial. Defense counsel attempted to clarify that the instruction sought an adverse inference, rather than suppression. Defense counsel further explained that *Ware* required uncollected evidence to be material and that where evidence is not collected due to an officer's gross negligence, the court should issue an instruction that any

6

uncollected evidence would have been unfavorable to the State. Defense counsel suggested that the delay in the lapel camera's recording was material to Defendant's case and that Sergeant Cottrell's failure to activate the camera to accommodate that delay was directly contrary to standard operating procedures, therefore constituting gross negligence. The State countered that the determination of whether Sergeant Cottrell was grossly negligent should have been determined before trial through a motion hearing, citing Rule 7-304 NMRA as support. The trial court opined that had there been a pre-trial determination as to gross negligence or reasonable inference, the tendered instruction may have been appropriate. Without such a determination; however, the trial court reasoned that the issue was one of pre-trial discovery and ultimately denied the requested instruction. The trial court noted that Defendant's argument seemed like an attempt to "back door an argument to the jury." Defense counsel then stated, for the record, that if the propriety of the instruction was an issue that should have been raised before trial, Defendant's trial counsel was ineffective. The trial court declined to find defense counsel ineffective.

{8}     Defendant took the stand as the only defense witness. She testified that on November 28, 2013, she had been on a dinner date with the male passenger and that they had consumed alcohol that evening. She testified that when they approached the checkpoint, he was driving and she was in the passenger seat of his truck. She testified

7

that the man stopped upon seeing the checkpoint, grabbed her by her arm and hair, threatened her, and pulled her into the driver's seat. While this was happening, the car drifted to the side of the road and hit the curb. She stated that the officer that came to the window of the truck asked her why she had switched places with the passenger, and whether she was going to take responsibility. Defendant testified that she did not answer the officer's questions because she knew that the officer had seen her switch places with the passenger. According to Defendant, when she told the officer she was taking responsibility, she was referring to switching places with the passenger; she did not yet realize she was part of a DWI investigation. The jury convicted Defendant of aggravated driving under the influence and careless driving.

## II.    DISCUSSION

### A.    Test Compliance with SLD Regulations

{9}    Defendant asserts that it was error for the trial court to deny her motion for directed verdict on the aggravated DWI charge when the State did not provide evidence that the breath test she refused either complied with SLD regulations or was certified by SLD. A directed verdict is appropriate if there is no legally sufficient evidentiary basis for a reasonable jury to rule in favor of the non-moving party. *See State v. Baca*, 2015-NMSC-021, ¶ 31, 352 P.3d 1151 ("A directed verdict, technically appropriate only in cases tried by a jury, requires a court to decide at the conclusion

8

of the state's case whether the direct or circumstantial evidence admitted at trial, together with all reasonable inferences to be drawn therefrom, will sustain a finding of guilt beyond a reasonable doubt." (internal quotation marks and citation omitted)), *cert. denied sub nom. Baca v. State*, ___ U.S. ___, 136 S. Ct. 255 (2015); *see also* Rule 5-607(E) NMRA (stating that "out of the presence of the jury, the court shall determine the sufficiency of the evidence, whether or not a motion for directed verdict is made"). Defendant seems to suggest we review this issue for an abuse of discretion; however, the proper standard of review for a denial of a directed verdict motion is sufficiency of the evidence. *See State v. Sena*, 2008-NMSC-053, ¶ 10, 144 N.M. 821, 192 P.3d 1198.

{10} "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *Id.* (internal quotation marks and citation omitted). "We do not weigh evidence or substitute our judgment for that of the trial court so long as the jury was presented with such relevant evidence as a reasonable mind might accept as adequate to support its verdict." *State v. Coleman*, 2011-NMCA-087, ¶ 19, 150 N.M. 622, 264 P.3d 523 (alteration, internal quotation marks, and citation omitted). "[A] reviewing court must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all

permissible inferences therefrom in favor of the verdict." *State v. Graham*, 2005-NMSC-004, ¶ 6, 137 N.M. 197, 109 P.3d 285 (internal quotation marks and citation omitted).

{11} We analyze the evidence for sufficiency in light of the jury instructions submitted at trial. *Coleman*, 2011-NMCA-087, ¶ 19; *see State v. Schackow*, 2006-NMCA-123, ¶ 8, 140 N.M. 506, 143 P.3d 745 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (internal quotation marks and citation omitted)).[1] "We review the district court's application of the law to the facts de novo." *State v. Barreras*, 2007-NMCA-067, ¶ 3, 141 N.M. 653, 159 P.3d 1138.

{12} To convict a defendant of aggravated DWI for a refusal to submit to testing, the state must prove beyond a reasonable doubt that:

      1.     The defendant operated a motor vehicle;

      2.     At that time the defendant was under the influence of intoxicating liquor; that is, as a result of drinking liquor the defendant was less able to the slightest degree, either mentally or physically, or both, to exercise the clear judgment and steady hand necessary to handle a vehicle with safety to the person and the public . . . ;

      3.     The defendant refused to submit to chemical testing[.]

---

[1]We note that the jury instructions actually given to the jury were not filed in the record proper. We therefore presume that the jury was instructed in accordance with the uniform jury instruction. Neither party suggests that the instructions given differ from the uniform instruction in any way.

10

UJI 14-4508 NMRA. Refusal to submit to chemical testing occurs if:

> 1. [T]he defendant was arrested on reasonable grounds to believe that the defendant was driving while under the influence of intoxicating liquor or drugs;

> 2. [T]he defendant was advised by a law enforcement officer that failure to submit to the test could result in the revocation of the defendant's privilege to drive;

> 3. [A] law enforcement officer requested the defendant to submit to a chemical breath . . . test;

> 4. [T]he defendant was conscious and otherwise capable of submitting to a chemical test; and

> 5. [T]he defendant willfully refused to submit to a breath . . . test.

UJI 14-4510 NMRA.

{13} It is clear from a review of the record that the State produced evidence that, when viewed in the light most favorable to the State, supports each of these elements. The testimony that when Sergeant Cottrell approached the truck moments after it had stopped, the engine was still running and Defendant was sitting behind the wheel is sufficient to give rise to an inference that Defendant operated the vehicle. Defendant's bloodshot, watery eyes and slurred speech, in addition to the truck's attempt to avoid the sobriety checkpoint, are sufficient to give rise to an inference that Defendant was under the influence of an intoxicating liquor. *Cf. State v. Anaya*, 2009-NMSC-043, ¶ 15, 147 N.M. 100, 217 P.3d 586 ("Evading a marked DWI checkpoint is a specific

11

and articulable fact that is sufficient to predicate reasonable suspicion for an investigatory stop."). Officer Frazier's testimony is direct evidence that he requested Defendant submit to a breath test, that Defendant was conscious when asked to submit to the test, that Defendant was advised of the possible repercussions of refusing to submit to the test, and that Defendant twice refused to submit to a breath test. To the extent that any contrary evidence exists, it was up to the jury and the jury alone to resolve conflicting evidence. *See State v. Sanchez*, 2000-NMSC-021, ¶ 32, 129 N.M. 284, 6 P.3d 486 (noting that conflicting evidence introduced by the defendant "does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts" (internal quotation marks and citation omitted)).

{14}     Defendant's assertion of error, stemming from a denied motion for directed verdict but based in the language of the statute itself rather than the elements set forth in the jury instruction, fails to take into account the nature of our review on appeal. The issue is not framed as one in which a jury instruction was altered to require the State to prove SLD certification, thereby allowing for the statutory interpretation that Defendant suggests. Rather, it is a denial of a directed verdict motion which we review for sufficient evidence and resolve in the light most favorable to the State. Additionally, Defendant has failed to cite to any legal authority to support her interpretation of the statute. *See ITT Educ. Servs., Inc. v. N.M. Taxation & Revenue*

12

*Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (noting that this Court will not consider issues that are unsupported by cited authority).

**B.      The *Ware* Instruction**

{15}      Defendant asserts that the trial court abused its discretion when it denied her proffered *Ware* instruction. The State argued and the district court agreed that the request for the *Ware* instruction should have been made before trial. Defendant responded by arguing that there is nothing in *Ware* requiring that a request for an adverse inference jury instruction based upon an officer's gross negligence, be made before trial. She also clarifies that she was not seeking a suppression remedy. On appeal, Defendant's argument largely ignores *Ware*'s requirements regarding evidence of gross negligence and entitlement to the instruction in general. There is nothing in the record to show that Defendant was entitled to the *Ware* instruction. As such, the trial court properly denied Defendant's request.

{16}      Whether a court properly refused a tendered jury instruction is a mixed question of law and fact. *State v. Lucero*, 2010-NMSC-011, ¶ 11, 147 N.M. 747, 228 P.3d 1167; *see State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183 (stating that an appellate court reviews "factual matters with deference to the [trial] court's findings if substantial evidence exists to support them, and it reviews the [trial] court's application of the law de novo"). "A defendant is entitled to an instruction on a theory

of the case where the evidence supports the theory." *State v. Salazar*, 1997-NMSC-044, ¶ 50, 123 N.M. 778, 945 P.2d 996.

{17}	Our Supreme Court has adopted a two-part test for deciding whether sanctions against the State are appropriate when police fail to gather evidence from a crime scene. *See Ware*, 1994-NMSC-091, ¶ 23 ("We do not condone shoddy and inadequate police investigation procedures at the expense of a criminal defendant's right to a fair trial."). First, "the evidence that the [s]tate failed to gather from the crime scene must be material to the defendant's defense." *Id.* ¶ 25. Whether evidence is material is a question of law to be determined by the court. *Id*. Evidence is material "if there is a reasonable probability that, had the evidence been available to the defense, the result of the proceeding would have been different." *Id.* (alteration, internal quotation marks, and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks and citations omitted).

{18}	Second, where the trial court decides the missing evidence is material, it then considers the conduct of the investigating officer. *Id.* ¶ 26. There are several levels of an investigating officer's conduct to be considered for purposes of this analysis: bad faith, gross negligence, negligence, oversight, or good faith. *Id.* An act done with bad faith is that which is done in an attempt to prejudice the defendant's case. *Id.* Gross

14

negligence occurs where, for instance, an officer acts in a manner that is "directly contrary to standard police investigatory procedure." *Id.* Where an officer's actions were grossly negligent, "the trial court may instruct the jury that it can infer that the material evidence not gathered from the crime scene would be unfavorable to the [s]tate." *Id.* However, if the investigating officer's failure to gather evidence appears to be the result of negligence, an oversight or done in good faith, sanctions such as suppression or a negative inference jury instruction are inappropriate. *Id.* In that situation, the defendant may simply "examine the prosecution's witnesses about the deficiencies of the investigation and argue the investigation's shortcomings against the standard of reasonable doubt." *Id.*

{19} It is clear from the evidence that Sergeant Cottrell activated his lapel camera. Although Sergeant Cottrell stated that he activated his lapel camera immediately upon approaching the truck, the lapel video introduced as an exhibit at trial begins moments into Sergeant Cottrell's conversation with Defendant. Sergeant Cottrell testified that the particular brand of lapel camera being used at that time was "not very user-friendly," explaining that they would sometimes fail to turn on and had poor video and sound quality. To turn the camera on, Sergeant Cottrell explained that a switch had to be turned to on, and then there was a three-second delay before the camera began recording. The record before us indicates the delay in Sergeant Cotrell's lapel camera,

15

resulting in a failure to record the first few moments of his interaction with Defendant, was certainly not anything more than "mere inadvertence or ordinary negligence" and cannot stand as a basis for an award of sanctions. *Id.* ¶ 27.

{20} We need not address whether the evidence that Sergeant Cottrell allegedly failed to collect was material because, it is clear that Defendant cannot show the officers' conduct in this case warranted the giving of the instruction. Defendant acknowledges that there is no evidence to support an assertion or finding of bad faith by Sergeant Cottrell. The majority of Defendant's briefing on this issue focuses on the fact that she was not seeking suppression, and that she instead sought only an inference instruction. Looking to the arguments she made below, it seems Defendant is suggesting that Sergeant Cottrell's failure to capture the first few seconds of his encounter with Defendant was gross negligence, which—if supported by evidence—may warrant such an instruction.

{21} While Defendant takes the time to point out that "jury instructions must conform to the evidence presented," she points to no evidence that suggests Sergeant Cottrell acted in a grossly negligent manner or in a manner that was directly contrary to standard police investigatory procedure. According to the evidence presented, even though APD generally expected officers to record every contact with civilians on their lapel cameras, that procedure had been specifically modified for the checkpoint that

16

evening. Instead of recording every contact, the procedure was to record encounters only once the officers had reasonable suspicion to conduct a DWI investigation.

**{22}** In addition, we note that even if Sergeant Cottrell's actions were the result of gross negligence, the trial court still has discretion in deciding whether to submit the *Ware* instruction to the jury. *See id.* ¶ 26 (stating that "[i]f it is determined that the officers were grossly negligent . . . the trial court *may* instruct the jury" as to an inference (emphasis added)).

**{23}** Defendant has made no argument that the missing evidence was material such that there was a reasonable probability that the missing evidence would have made a difference in the result of Defendant's proceedings. The evidence does not support Defendant's assertion that Sergeant Cottrell's actions in this case were grossly negligent. As such, Defendant was not entitled to have a *Ware* instruction submitted to the jury. Because she was not entitled to the instruction at all, we need not decide when a proffer of a *Ware* instruction must be made.

## C.    Ineffective Assistance of Counsel

**{24}** After the trial court denied Defendant's requested *Ware* instruction, defense counsel, assuming the denial was based on the timing of the request, suggested that he had been ineffective for failing to raise the issue pretrial. On appeal, Defendant suggests that she was prejudiced because the district court refused to consider giving

17

the tendered instruction due to the timing of the request, the district court would have given the instruction if the request had been timely, and the results of the proceeding would have been different if the instruction had been given. Defendant does not, however, demonstrate that her counsel's performance fell below the standard of a reasonably competent attorney. *See State v. Hester*, 1999-NMSC-020, ¶ 9, 127 N.M. 218, 979 P.2d 729 (stating that the rule to prove the ineffective assistance of counsel claim, the defendant must show that "counsel's performance fell below that of a reasonably competent attorney," and that "the deficient performance prejudiced the defense" (internal quotation marks and citation omitted)).

{25}     "When an ineffective assistance claim is first raised on direct appeal, we evaluate the facts that are part of the record." *State v. Roybal*, 2002-NMSC-027, ¶ 19, 132 N.M. 657, 54 P.3d 61. "If facts necessary to a full determination are not part of the record, an ineffective assistance claim is more properly brought through a habeas corpus petition, although an appellate court may remand a case for an evidentiary hearing if the defendant makes a prima facie case of ineffective assistance." *Id.* "Habeas corpus proceedings are the preferred avenue for adjudicating ineffective assistance of counsel claims, because the record before the trial court may not adequately document the sort of evidence essential to a determination of trial counsel's effectiveness." *State v. Grogan*, 2007-NMSC-039, ¶ 9, 142 N.M. 107, 163

18

P.3d 494 (alternation, internal quotation marks, and citation omitted). "This preference stems from a concern that the record before the trial court may not adequately document the sort of evidence essential to a determination of trial counsel's effectiveness." *State v. Schoonmaker*, 2008-NMSC-010, ¶ 31, 143 N.M. 373, 176 P.3d 1105 (internal quotation marks and citation omitted), *overruled on other grounds by State v. Consaul*, 2014-NMSC-030, ¶ 38, 332 P.3d 850. As such, Defendant's ineffective assistance of counsel claim is more appropriately addressed through habeas proceedings.

## III.   CONCLUSION

{26}    For the reasons stated above, we find no error in the trial court's decision to deny Defendant's motion for directed verdict and tendered jury instruction. We also find that Defendant's claim of ineffective assistance of counsel is more appropriately addressed through habeas proceedings.  We therefore affirm Defendant's convictions.

{27}    **IT IS SO ORDERED.**

_____

**M. MONICA ZAMORA, Judge**

19

**WE CONCUR:**

_____
**TIMOTHY L. GARCIA, Judge**

_____
**J. MILES HANISEE, Judge**